# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

IN THE MATTER OF THE SEARCH OF
5332 TALLAPOOSA ROAD,
TALLAHASSEE, FLORIDA 32303

Case No: 4:18mj14-CAS

<u>UNDER SEAL</u>

_____/

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
## RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jeffrey Watson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the single family residence and any outbuildings located on the property, located at 5332 Tallapoosa Road, Tallahassee, Florida, 32303 (SUBJECT LOCATION), described in Attachment A, for the items described in Attachment B.

2. I am a Special Agent with the Florida Department of Law Enforcement (FDLE) currently assigned as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I have been a Special Agent with FDLE since June of 2014 and a DEA TFO since January 2017. Prior to my assignment as a DEA TFO, I was assigned as a FDLE Special Agent assigned to the Organized Crime squad. Prior to that, from approximately October 2002 through June 2014, I was employed as a Deputy Sheriff with the Columbia County

Sheriff's Office (Florida). During my time with the Columbia County Sheriff's Office, I served from approximately November of 2011 until June of 2014 as the supervisor of a multi-jurisdictional drug task force. I have received extensive training and experience concerning drug investigations, and I have participated in the investigation of federal and state drug investigations on numerous occasions. In connection with my duties and responsibilities as a state and federal law enforcement officer, I have testified in judicial proceedings and prosecutions for violations of laws concerning controlled substances. I have also assisted in the preparation and execution of numerous state and federal search warrants.

3. Based upon my training, experience and participation in the investigation and seizure of controlled substances, I know:

   a. that individuals involved in the manufacturing and distribution of controlled substances maintain books, records, receipts, notes, correspondence, ledgers, and other records, relating to the transportation, ordering, and/or distribution of controlled substances, even though sometimes in code; such individuals commonly front (deliver on consignment) controlled substances and maintain such records in doing so;

   b. that it is common practice for those involved in illicit drug trafficking of controlled substances to secret contraband, proceeds of drug sales, and records of drug transactions in secure locations within the residence and/or other locations for ready access, and to conceal them from law enforcement authorities;

   c. that persons involved in illicit drug trafficking conceal in their residences caches of drugs, large amounts of currency, financial instruments, and other assets of value which are the proceeds of drug transactions; and evidence of financial transactions relating to

obtaining, transferring, secreting, or spending of large sums of money related to engagement in drug trafficking activities;

d. that persons engaged in illicit drug trafficking maintain on the premises, paraphernalia for packaging, cutting, weighing, and distributing controlled substances, and equipment used in the packaging, weighing, and otherwise preparing for the distribution of controlled substances;

e. that persons engaged in illicit drug trafficking maintain on the premises addresses and telephone numbers in books or papers which reflect the names, addresses, and/or telephone numbers for their sources, customers, and associates related to their drug trafficking activities, even though sometimes in code;

f. that persons engaged in illicit drug trafficking maintain on the premises photographs and/or video cassettes of co-conspirators, associates, assets, and controlled substances;

g. that persons engaged in illicit drug trafficking maintain on the premises tickets, schedules, papers, notes, receipts, and other items relating to domestic and foreign travel; and,

h. that persons involved in distributing controlled substances keep and maintain firearms and other explosive devices to protect themselves from other drug traffickers and from apprehension by law enforcement officers.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

5. Since September, 2017, the Drug Enforcement Administration (DEA), the Florida Department of Law Enforcement (FDLE), and other law enforcement

agencies have been conducting a criminal investigation into a suspected drug trafficking organization (DTO), which has shown that the members of the DTO are involved in the distribution of controlled substances, including cocaine HCL (powder), crystal methamphetamine, and pharmaceutical tablets, in the Northern District of Florida (NDFL).

6. On September 5, 2017, the Honorable James Hankinson, State of Florida Second Judicial Circuit Judge, granted a State Title III wiretap for telephone number (850) 528-2299 (CRUTCHFIELD's phone) being used by Barney CRUTCHFIELD. Monitoring of communications pursuant to the wiretap orders began on September 5, 2017.

7. On October 4, 2017, the Honorable James Hankinson, Second Judicial Circuit Judge, granted a second State Title III wiretap for CRUTCHFIELD's phone. On November 3, 2017, the State Title III Court Order targeting CRUTCHFIELD's phone was terminated.

8. On October 19, 2017, the Honorable Mark Walker, United States District Judge for the Northern District of Florida, authorized a Title III wiretap on cellular telephone (850) 274-6061 (KING's phone), currently being utilized by Adam Joseph KING, an associate of CRUTCHFIELD. On October 20, 2017, agents began monitoring communications on KING's phone.

9.  On November 1, 2017, the Honorable Mark Walker, United States District Judge for the Northern District of Florida, authorized a federal Title III wiretap on CRUTCHFIELD's phone. Monitoring began on November 3, 2017, following the termination of interceptions on the state wiretap.

10. On November 17, 2017, the Honorable Mark E. Walker, District Court Judge for the Northern District of Florida, granted 30-day extension of the federal Title III wiretaps on Wiretap Telephones #1 and #2. On November 22, 2017, the Honorable Mark E. Walker, District Court Judge for the Northern District of Florida, granted an amended order as to the 30-day extension of the federal Title III wiretap on Wiretap Telephones #2.

11. On December 18, 2017, the Honorable Mark E. Walker, District Court Judge for the Northern District of Florida, granted 30-day extension of the federal Title III wiretap on Wiretap Telephones #1. Monitoring began on December 19, 2017, and is on-going.

12. While monitoring wiretaps, agents have intercepted numerous communications in which CRUTCHFIELD arranged the sale of cocaine and/or crystal methamphetamine, in addition to moving semi-automatic firearms, from CRUTCHFIELD's residence. Through the use of electronic surveillance, physical surveillance, and operations targeting CRUTCHFIELD's DTO, agents have been

able to corroborate wiretapped communications indicating that CRUTCHFIELD is storing firearms at the SUBJECT LOCATION.

13. On December 2, 2017, at approximately 3:35 p.m., agents intercepted communications between CRUTCHFIELD and James CASE. During the intercepted communication, CRUTCHFIELD told CASE he needed to move firearms from his residence to another location, possibly CASE's residence. CASE told CRUTCHFIELD he did not need the firearms at his residence either. CRUTCHFIELD was in fear that law enforcement would be coming to his residence after Bobby SCREWS was arrested for possession of two ounces of cocaine, on November 28, 2017, after picking it up and purchasing it from CRUTCHFIELD, at CRUTCHFIELD's residence.

14. On December 2, 2017, at approximately 6:58 p.m., agents intercepted communications between CRUTCHFIELD and Amanda WORLEY. CRUTCHFIELD originally planned to take the firearms from his residence, to a storage unit located at Barrington apartment condominiums. WORLEY is the manager at the Barrington apartment condominiums. WORLEY told CRUTCHFIELD that Paul TYRE would be present with her. CRUTCHFIELD told WORLEY he would be there in approximately twenty minutes. On the same date, while monitoring electronic surveillance at CRUTCHFIELD's residence, agents saw CRUTCHFIELD enter his Chevrolet Tahoe vehicle, Florida license plate

#6222JQ. CRUTCHFIELD was seen reversing the Tahoe vehicle into the garage where he presumably loaded the firearms from within his residence, into the vehicle. At approximately 7:32 p.m., agents observed CRUTCHFIELD departing from his residence, driving the Tahoe vehicle. At approximately 8:00 p.m., agents observed CRUTCHFIELD, WORLEY, and TYRE meet at the Barrington apartment condominium. Agents observed the vehicles meet at the location. No other observations were made.

15. On December 2, 2017, at approximately 8:07 p.m., agents intercepted communication between CRUTCHFIELD and WORLEY. CRUTCHFIELD told WORLEY he was going to take the firearms to Phillip "Paul" TYRE's house instead, due to the amount of people in the parking lot of the apartment complex. TYRE lives at the SUBJECT LOCATION. WORLEY told CRUTCHFIELD no one would care or see anything. CRUTCHFIELD said as soon as he pulled an AR-15 out of his vehicle and walked across the parking lot with it, someone would call law enforcement. CRUTCHFIELD went on to tell WORLEY he had mini 14's, AR-15's, and M-16 assault rifles in his vehicle. CRUTCHFIELD said none of the firearms themselves were illegal because they were not fully automatic, only semi-automatic. WORLEY agreed with CRUTCHFIELD's idea of him taking the firearms to TYRE's house, the SUBJECT LOCATION.

16. On December 3, 2017, at approximately 11:45 a.m., agents intercepted communication between CRUTCHFIELD and TYRE. During the intercepted communication, CRUTCHFIELD told TYRE he was cleaning the rest of that "stuff" out of his closet at his residence. CRUTCHFIELD said he was moving some of that "stuff" and putting it at his office. However, CRUTCHFIELD said he was going to "bag" some more "stuff" and would like to rent a closet from TYRE. CRUTCHFIELD told TYRE he would, "pay the rent for the closet" for a little while. TYRE said that would be fine. This intercepted communication leads agents to believe that CRUTCHFIELD planned to store more illegal contraband at TYRE's residence (the SUBJECT LOCATION), in addition to the firearms he previously mentioned storing at the SUBJECT LOCATION.

17. On December 19, 2017, at approximately 2:56 p.m., agents intercepted an incoming communication between telephone number, (607) 203-9685, utilized by an individual identified as "Mike", CRUTCHFIELD's phone, used by Barney CRUTCHFIELD. During the communication, the person identified as "Mike" told CRUTCHFIELD he inherited a large sum of firearms. Mike went on to tell CRUTCHFIELD he was a convicted felon and could not possess firearms. CRUTCHFIELD then told Mike that he owned a "Shit ton" of weapons even though he was not allowed to possess firearms. CRUTCHFIELD told Mike to place the firearms in a storage shed. CRUTCHFIELD told Mike he could own

firearms, he just could not keep them in his possession. CRUTCHFIELD told Mike that he kept all his firearms at his friend's house. CRUTCHFIELD said he wrapped all his firearms in a blanket and loaded them in his Tahoe, then took them to his friend's house. CRUTCHFIELD told Mike his firearms are located inside a closet at his friend's house that is locked with a key lock. CRUTCHFIELD said his friend had a son who recently moved out and the closet where his firearms are stored are located in that son's old bedroom. CRUTCHFIELD said he possessed the key to the lock, where his firearms are located. As mentioned above, agents were aware that CRUTCHFIELD made statements that he was taking his firearms to the SUBJECT LOCATION, which is the residence his friend, Phillip "Paul" TYRE. Also, as mentioned above, agents have captured CRUTCHFIELD on electronic surveillance at his residence, reversing his Tahoe into his garage, within the same time frame in which CRUTCHFIELD said he would be taking his firearms, referred to as "Bang bangs" to the SUBJECT LOCATION.

18. Although agents have intercepted multiple communications between TYRE and CRUTCHFIELD following the movement of the firearms on December 19, 2017, including communications as recently as January 5 and 6, 2018, agents have not intercepted any communications nor have they observed any activity on the electronic surveillance at CRUTCHFIELD's house which would indicate that he has moved the firearms and/or other evidence from the SUBJECT LOCATION.

19. CRUTCHFIELD has felony convictions in the State of Florida prohibiting him from possessing firearms.

20. Based on the information set forth above, I believe that TYRE is using the subject location to store firearms, drugs, and other evidence related to Barney CRUTCHFIELD's illegal drug organization.

## AUTHORIZATION REQUEST

21. This affidavit is made in support of a warrant to search the Subject Location as described in Attachment A, for the items further described in Attachment B.

22. To ensure the safety of the executing agent(s) and to avoid premature disclosure of the investigation, it is requested that the agents be permitted execute the warrant during both daytime and nighttime hours as deemed appropriate by the executing agent(s) to maximize concealment.

## SEALING REQUEST

23. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.

24. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## CONCLUSION

25. I submit that this affidavit supports probable cause for a search warrant authorizing the search of the residence described in Attachment A, to seek the items described in Attachment B.

                                                    Jeffrey Watson
                                                  Task Force Officer/ DEA

Subscribed and sworn to before me this 16 day of January, 2018.

                                                  The Honorable Charles Stampelos
                                                  United States Magistrate Judge

## ATTACHMENT A

The residence is located at 5332 Tallapoosa Road, Tallahassee, Florida, 32303 (SUBJECT LOCATION), within the Northern District of Florida. The residence is located within the Oak Valley/Russell's Pond neighborhood. The Oak Valley/Russell's Pond neighborhood is located by travelling north on Monroe Street in Tallahassee, Florida. The entrance to the subdivision is clearly marked by a green sign with white lettering that reads "Oak Valley" with another that reads "Russell's Pond." The residence to be searched is located on the north side of Tallapoosa Road. The residence has a stone exterior with beige siding/boarding and a charcoal shingle roof. The place to be searched includes any additional structures, and/or vehicles present at the SUBJECT LOCATION during the execution of the Search Warrant. Photographs of the residence are attached.





## ATTACHMENT B

## ITEMS TO BE SEIZED

Evidence of violations of 21 U.S.C. § 841(a) and 846 (Distribution and Possession With Intent to Distribute Controlled Substances) and 18 U.S.C. § 922(g) (Possession of a Firearm by a Prohibited Person) (Subject Offenses), including-

1. Illegal narcotics;

2. Firearms and ammunition;

3. United States currency, precious metals, precious stones, jewelry, and financial instruments, including stocks and bonds, which are related to the Subject Offenses;

4. Paraphernalia for manufacturing, packaging, weighing and distributing of controlled substances;

5. Property constituting evidence of the commission of the Subject Offenses, including contraband, and property designed and intended for use as the means for committing the Subject Offenses as well as paraphernalia used to prepare controlled substances for distribution and personal use, as well as machinery and/or devices, used for the preparation of controlled substances for distribution and personal use;

6. Cellular telephones relating to the Subject Offenses;

7. Information contained on cellular telephones (to included installed storage medium) relating to the Subject Offenses, including, but not limited to, call records, text messages (both SMS and MMS), data from applications contained on the phone, photographs, video recordings, audio recordings, browser history, any records or documents stored in electronic format, evidence of device ownership, and any other information, all relating to the Subject Offenses.

8. Computers and computer devices, flash drives, or other means of electronic data storage which may be used to digitally store records of or information associated with drug trafficking;

1

9. Information contained on computers and computer devices, flash drives, or other means of electronic data storage (to included storage medium) relating to the Subject Offenses, including, but not limited to, digital records and documents, messaging services, email, data from applications installed on the device, photographs, video recordings, audio recordings, browser history, evidence of device ownership, and any other information, all relating to the Subject Offenses.

10. Receipts, records, and documents depicting subscriber data and itemized calls, as well as reflecting cellular telephone ownership or use, relating to the Subject Offenses;

11. Papers, tickets, notes, schedules, receipts and other items involving travel relating to the Subject Offenses;

12. Books, records, receipts, notes, ledgers, invoices, designated codes, diaries, bank statements and records, purchase records, cash receipts and disbursements journals, inventory records, financial statements, insurance records, loan applications and records, wills, real estate records, money drafts, letters of credit, money orders and cashier's checks, safe deposit box keys, and other documents evidencing the obtaining, secreting, transfer, and/or secreting currency equivalent relating to the Subject Offenses;

13. Records, journals, promissory notes, receipts, loans and loan repayment information, and other documents reflecting transactions between any Financial Institution and other individuals and entities which are fruits, evidence and instruments of the Subject Offenses;

14. Photographs, video recording, CD's, DVD's, slides, or any photographic medium showing any items or conduct or other depiction relating to the Subject Offenses;

15. Records indicating occupancy, residency, and/or ownership of the premises, including, but not limited to utility and telephone bills, cancelled envelopes, and keys;

16. Documents, books, telephones, telephone answering machines, and pagers reflecting names, addresses and/or telephone numbers relating to the Subject Offenses;

17. Equipment used to detect police activities and surveillance, including radio scanners, and tape and wire transmitter detectors;

18. Any of the above listed evidence which is stored in a locked cabinet, safe, or other container, related to violations of Subject Offenses.

19. Any vehicles, or conveyances on the property in which individuals may have concealed Controlled Substances, currency, indicia of drug trafficking, or other evidence as set forth above, relating to the Subject Offenses.

20. Receipts, records, and documents indicating ownership, association, and utilization of vehicles, to include maintenance and improvements to the vehicles, relating to the Subject Offenses.

21. All video recordings of activities occurring at the searched location which depict violations of the Subject Offenses.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles,

email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the COMPUTER user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h. evidence of the times the COMPUTER was used;

    i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    k. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.